311 So.2d 851 (1975)
STATE of Louisiana
v.
Charles FORT.
No. 55706.
Supreme Court of Louisiana.
April 24, 1975.
*852 Murphy W. Bell, Director, Michael Cavanaugh, Trial Atty., Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Bob H. Hester, Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
Charles Fort and Raymond Hunter were jointly charged with the armed robbery of T. W. Larsen on July 4, 1973. La.R.S. 14:64. When the matter came for trial on January 28, 1974, the District Attorney elected to sever and filed separate bills. He also moved to reassign the trial of Fort.
The case proceeded against Hunter, however, and after several motions were overruled and several jurors were sworn and impanelled, counsel for the accused advised the court that Hunter wished to withdraw his former plea of not guilty and plead guilty. The trial judge then interrogated Hunter, ascertained that his plea was free and voluntary and that he was aware of the consequences. The guilty plea was then entered and accepted.
During the trial of Fort, Officer Hill of the Baton Rouge Police testified that he was living in an apartment house and serving there during his off duty hours as security officer. About six o'clock on the evening of July 4, 1973, after walking his dog, he encountered two men in the hall on his way back to his apartment. His attention was first called to them by the barking of his dog. They inquired if he knew where "Johnson" lived. Since he did not know, he directed them through the hall of the apartment house to the manager's (Larsen's) apartment. When they knocked on Larsen's door, Hill returned to his apartment. Five minutes later, Larsen came to Hill's apartment and told him he had been robbed.
Hill said he got a good look at the two men and positively identified Fort who was then in court.
On July 5, the next day, around 7:30 in the morning, while going to work in his car, Hunter was coming out of a section of the apartment when Hill recognized him as one of the two men he had encountered the day before. Hill asked him to come with him to the manager's apartment, and Hunter fled. As he did so, he pulled a blue steel revolver from his pants. Hill called for police help, and the search that followed resulted in the apprehension of Hunter hiding under a house in the neighborhood. A blue steel revolver resembling the one Hunter pulled on Hill was found under the house.
*853 Hunter was taken into custody and upon questioning disclosed that Fort was his accomplice in the robbery. Later police officers brought a picture book containing about 800 pictures, thirty per page, to Hill's apartment to determine whether he could identify Fort from the collection. He identified the pictures of Hunter and Fort as the two men he directed to Larsen's apartment.
While Hill was being questioned at the trial, the State's Attorney asked him if there was anyone else in the courtroom who resembled Fort. He readily pointed out Fort's brother and Fort also.
On cross-examination the defense counsel asked Officer Hill how he was able to say that the man he saw that night was Fort, not this man (in court) his brother, or any other black man. Pointing out that it was six o'clock p.m. in the summer and that the sun had not set, Hill answered he saw defendant clearly and that he was wearing an orange athletic shirt, maroon pants and a gold earring in his left ear on July 4. Defense counsel then asked him if he had ever made a different statement; did he ever say that he didn't know what clothes Fort was wearing. Hill answered that he didn't remember the clothes Fort was wearing when he was arrested on July 5, but he definitely did remember the clothes he was wearing on July 4.
The colloquy between them continued and Hill steadfastly adhered to his statement.
Defense counsel then asked Hill whether he had ever said he was able to identify Fort because of the color of his skin. Hill denied saying that and explained that he had said their looks were similar, but that he had not said he could identify Fort entirely by the color of his skin. Reference to the skin color, however, had been part of the identification Hill said he relied upon. He had told the officers Fort was a light skinned black male. Defense counsel then asked, "Okay. Weren't you asked before: `Isn't it true, for instance, that that man right there has almost identical features with this man right here, except for his skin color?' And you said, `Yes, Yes.' Isn't that true?"
At that point, the State's Attorney objected that a proper foundation had not been laid for impeaching the witness. In an effort to be helpful, the trial judge advised defense counsel that if he intended to impeach the witness he must lay the proper predicate.
Whereupon, defense counsel continued the interrogation and asked Hill if he could say "this man as beingand you're able to say he's different from this man for what reason?" (Although the record does not make clear who was referred to it is inferred that the reference was to Fort and his brother.) Hill proceeded to distinguish them by the color of their skin and the difference in the size of their nostrils when he was interrupted. Defense counsel asked if he had ever made a statement different from that once before in court to the effect that the men have the same characteristics except for skin color. Hill replied that although he had said they were similar, he didn't say they were exactly the same, and he didn't remember saying differently. When objection was again made by the State, the trial judge instructed defense counsel how to lay the predicate if he intended to impeach the witness.
Thereupon Hill was asked by the defense if he had ever testified in the case. (A mistrial had been granted to a prior trial at which Hill had testified.) Defense counsel then asked, "Do you recall whether one of those questions was: `Isn't it true, for instance, that this man right here has almost the identical features with that man right there, except for his skin color?.'" Hill recalled the question and said he answered it by saying that they had similar features `but they could be distinguished apart." He denied that he had said only their skin color was different.
Later, during the trial defense counsel sought to introduce into evidence the entire *854 prior testimony of Officer Hill for the purpose of impeachment and to read it to the jury. The State's Attorney objected that the paper sought to be introduced was not certified as part of the transcript. A recess was granted to allow counsel to obtain a certified copy.
When court reconvened, defense counsel had a true transcript and changed his earlier request. He then sought to read to the jury "only one question and one answer, that being the specific question and answer that Officer Hill did not specifically admit to having made." To this request the State objected that reading of one question out of context would be unfair to the State. He objected also to reading the whole testimony "because of the fact that there was some pointing and things going on that were not picked up by the transcript."
Defense counsel conceded that the record did not reflect who he was pointing to in his questions to Hill regarding the identification, to which the trial judge remarked, "So it would be questionable to the jury whether you were pointing to a white man, a black man, a photograph, a statue, a witness, a juror, or anything else."
The discussion continued between the judge and both counsel in an effort to arrive at an agreement as to what portion of the prior transcript should be introduced. When no agreement could be reached, defense counsel sought to introduce about one page of the transcript which recorded the evidence he relied upon to impeach the witness. Again the State objected and the objection was sustained. Defense counsel then reserved a bill and made part thereof the entire testimony of Officer Hill at the previous trial.
A discussion then followed in which the trial judge asserted that he did not understand the offer to be the entire testimony and that his ruling was intended to deny the reading of a single question and answer to the jury. Defense counsel then asked that he be permitted to change his request to the context testimony. Again the State objected and was sustained. Again the defense reserved a bill and made part thereof the testimony he sought to read to the jury.
In our view the State's Attorney's objections were entirely too technical and they should not have been sustained. The State's unclear position in this matter granted no quarter, and its position is not adequately explained. Unfortunately the bill was not properly perfected, for the testimony of Hill at the previous trial made part of the bill was not attached in this record and we have no access thereto.
Notwithstanding this irregularity and the State's improper objections, we are unable to say that prejudice resulted. An examination of the entire record before us convinces us that no miscarriage of justice occurred and there was no prejudice to the substantial rights of the accused, nor did a substantial violation of a constitutional or statutory right occur. La.Code Crim.Proc. art. 921.
There was no denial of confrontation. Hill was available for, and was in fact subjected to, extensive and repeated cross-examination on every aspect of the case. We have belabored the record with an extensive summary of his testimony to illustrate the thoroughness of the cross-examination and the consistency of the testimony. Even if his testimony had been impeached as defense counsel sought to do on the narrow point of skin color, it was on an insignificant point not crucial to the identification and would not have changed the verdict when the other evidence at the trial is considered. Hill only used skin color as part of the identification factors.
Larsen, the victim, testified two black males robbed him at gun point in his apartment at six o'clock on the evening of July 4, 1973. He was unable to identify them, however, because of the poor lighting in his apartment and because they made him lay on the floor face-down.
*855 Hunter, the accomplice, testified. He admitted his participation, and that of Fort. They were armed, he said, and recounted the details of the entire incident.
Officer Varnado testified that he participated in Hunter's arrest on July 5, and retrieved the revolver and some of the money from under the house where Hunter was hiding. A bank bag which contained the money was later found nearby.
Detective Gill verified officer Hill's photographic identification of Fort. He also verified that Hunter had given him a statement.
A judgment should not be reversed where the ruling complained of would have had no effect upon the verdict due to the overwhelming evidence of guilt in the record. La.Code Crim.Proc. art. 921.
For the reasons assigned, the conviction and sentence are affirmed.
DIXON, J., concurs.
BARHAM, J., dissents.